Filed 7/20/23  P. v. Jones CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARCUS JONES,<br><br>    Defendant and Appellant. | B320040<br><br>(Los Angeles County<br>Super. Ct. No. YA037935) |

APPEAL from an order of the Superior Court of Los Angeles County, Laura C. Ellison, Judge.  Affirmed.

Tracy Dressner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Marcus Jones and his cousin, Melvin Jones (Melvin), robbed a small store when they were teenagers. During the robbery, the owner of the store was shot and killed. Appellant and Melvin were both convicted of robbery and murder.

Appellant subsequently filed a petition for resentencing pursuant to Penal Code section 1172.6 (former section 1170.95), which the trial court denied after an evidentiary hearing.[1] Appellant contends the trial court's findings that he was a major participant in the crime and acted with reckless indifference to human life are not supported by substantial evidence. We disagree and affirm.

## FACTUAL BACKGROUND

We draw the facts below from the evidence admitted at appellant's section 1172.6, subdivision (d)(3) evidentiary hearing pursuant to the parties' stipulation. That evidence consisted of: (1) a transcript of percipient witness Antonio Ochoa's trial testimony; (2) an investigatory police report from the Inglewood Police Department (police report); (3) a transcript of a surreptitiously recorded conversation between appellant and Melvin following their arrest shortly after the crime; (4) a psychiatric report prepared in 1996 to determine appellant's fitness for juvenile court treatment (psychiatric report); (5) a transcript of appellant's trial testimony; (6) a probation report prepared when appellant was sentenced; (7) the Supreme Court's

---

[1] Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute. We hereafter refer to the statute as section 1172.6. All further statutory references are to the Penal Code unless otherwise indicated.

opinion in *People v. Superior Court (Jones)* (1998) 18 Cal.4th 667; and (8) the opinion a different panel of this court issued in appellant's direct appeal, *People v. Jones* (Sept. 25, 2001, B143098) [nonpub. opn.].[2]

## I.    Ochoa's Trial Testimony

Around 7:45 p.m. on May 23, 1996, Ochoa was sweeping outside his workplace, the Park Avenue Market in Inglewood. The store's owner, Won Hee Lee, was seated behind the counter inside the store, near the two cash registers. There was only one way into and out of the small store, and only one way to get behind the counter.

Ochoa saw two black males who appeared to be about 16 or 17 years old, later identified as appellant and Melvin, emerge from a "small alcove" and walk toward the store. One was wearing dark blue pants, and the other was wearing green pants. As they neared Ochoa, they covered their faces with beanies or masks. Ochoa said the person in the green pants drew a revolver from his waistband, and then both individuals "backed up and went inside the store." Ochoa "had a feeling" that they "were robbing the store."

While still outside but only about four or five feet from the person with the gun, Ochoa looked into the store and saw that the person with the gun "had it on Mr. Lee, facing Mr. Lee," with an outstretched arm. Ochoa lost sight of the person in the blue pants when he went around a freezer. Ochoa heard one of them say, "Okay. This is –." As he turned to another person outside and told them to call the police, Ochoa heard a gunshot. About

---

[2]    The witness testimony and psychiatric report were the only pieces of this evidence also admitted at appellant's trial.

3

30 seconds later, Ochoa saw the two males walk out of the store, cross the street, then start running away together.

Ochoa saw a police officer nearby and yelled that his boss had been shot. He then got into his car and followed appellant and Melvin as they fled. After he saw them jump a fence surrounding an elementary school, Ochoa drove around the school and saw them walking into "some apartments." By that time the police had arrived, and Ochoa drove back to the store, where he spoke to additional police officers and saw money lying in the doorway of the store. The police later drove Ochoa back to the apartments, where he identified appellant and Melvin as the people he had seen in the store. At trial, he identified appellant as the person who did *not* have the gun.

## II. Police Report

The police report contains the statements of several percipient witnesses. Three witnesses reported seeing two Black male teenagers near the store before the incident. Two of the witnesses recognized Melvin and said he was wearing black pants; one said she knew him to be a gang member. Another witness said one of the males was wearing black, and the other, who wore green, was "doing something near his waistband." All three witnesses saw the same teens running away from the store a short time later. A fourth witness who lived next to the store heard a gunshot and then saw two Black males running away from the store. He said one of them was wearing green pants and carrying a gun. All four witnesses identified appellant and Melvin as the people they had seen during a field show-up.

The police report also contains statements from officers. Around the time of the shooting, police officers Goodro and Vaselenko were near the store making an unrelated arrest.

4

Goodro heard a gunshot and turned to see two suspects run out of the Park Avenue Market. One of them was holding a revolver. Goodro heard witnesses yelling that someone had been shot. Goodro chased the suspects on foot, and Vaselenko pursued them in the officers' vehicle. Vaselenko saw the suspects run down a driveway toward an apartment building; they were detained at the top of the building's staircase.

Investigating officer and report author Harkins responded to the Park Avenue Market around 10:00 p.m. on May 23, 1996. Harkins "observed an unknown amount of U.S. paper currency on the floor, located west of the store's entrance/exit." Officer Flores, who was one of the first to arrive on the scene and had located five witnesses, told Harkins that two suspects had entered the store that evening, and one of them was armed with a revolver. Flores said the armed suspect shot Lee in the head, and "[t]he suspect's [*sic*] then removed paper currency from the cash register and left the store running n/b on Park Ave." Flores also reported that the suspects dropped or discarded "numerous pieces of evidence" between the store and the location where they were detained. Other officers showed Harkins a dollar bill and green button on the sidewalk, a green scarf and a "blue rubber mask-like object" in a nearby front yard, a gray sweatshirt by the school, and a revolver lying in the front yard of the home next to the apartments where the suspects were apprehended.

When he was arrested, appellant was wearing a gray t-shirt and green sweatpants. Melvin was wearing a white t-shirt and black pants. The booking officer recovered $31 in cash from appellant's pants pockets: two $5 bills from the left front pocket, and two $10 bills and one $1 bill from the right front pocket.

5

When he was asked how much money he had, appellant told the officer he "should have ten dollars."

After he was advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, appellant told officers that he and Melvin went to Melvin's apartment after school that day. Around 5:00 p.m., he and Melvin went to a liquor store and got someone to buy them a bottle of vodka, which they shared. They then walked around the area of the Park Avenue Market, which Melvin had been talking about robbing since that morning, "because they could get away with it here." Appellant told Melvin "he wasn't ready to do this" and tried to persuade Melvin not to rob the store. He also said, however, that he did not want Melvin to go in alone "because he didn't want him to get shot."

The plan was to go into the store, tell everyone in there to get down on the floor, "rush the cash register," get the money, and leave. Appellant "figured Melvin wouldn't rob a liquor store without" a gun, and, indeed, Melvin withdrew a revolver from his sock right before they entered the store. Appellant did not know where Melvin got the gun, and he stated that "[t]he plan wasn't to shoot anyone." He also told the officers, "It never works like you plan."

Before they entered the store, appellant "put a black facial thing around his head" and donned one black glove. Appellant thought Melvin "might have put a blue beanie or something on his head." Melvin then entered the store, and appellant followed, standing "between the doorway and the front counter." Appellant "'heard the blam' and saw the victim fall back." He thought Melvin "reached over the counter and took the money out of the register." Melvin gave the money to appellant, who had about $17 before entering the store. Melvin and appellant then left the

store and ran to Melvin's house, hopping the fence of a nearby school on the way.

Harkins attended Lee's autopsy a few days later.  The coroner concluded that Lee died of a single gunshot wound to the head.  The bullet entered the left corner of Lee's mouth and traveled through his teeth, tongue, and brain before coming to rest near his right ear.  The coroner observed "stifling [*sic*]" and black powder near Lee's mouth and concluded he was shot at close range "of less than eighteen inches and probably as close as six inches."

## III.   Surreptitious Recording

After arresting appellant and Melvin, the police placed them in the back of a police cruiser that had a tape recorder running.  Appellant and Melvin proceeded to have an expletive-laden conversation about the incident.

Appellant repeatedly told Melvin that he should not have "blasted" or "busted" Lee in the face.  Melvin said several times that he "didn't try to," though he also said to appellant, "I don't know why you even busted him, dude."  At one point, appellant told Melvin, "you shot that n***** in cold blood, though, cuz." Later, appellant said, "I knew I shouldn't do this shit. I tried to do a fuckin' favor, … like n***** don't do it.  You still made me go in there, and I couldn't even stop you from busting that n*****. Fucked my life up."  Appellant also stated, "I saw you went into the store.  I saw you blastin' on that n***** like bam, I was like damn, you know what I'm saying?  We can't do shit but grab

7

money, man, we fuckin' just sweatin' like . . . ." Melvin responded, "We got like 20 bucks, n*****."[3]

Appellant said, many times in many ways, that Melvin had "fucked up." He also said, however, that he did not "blame" Melvin, once adding, "That's why I got hell fuckin' drunk, so you can be like – you know what I'm saying, no, I don't do that shit. I know you shouldn't have fuckin' held the gun, man. I know you fuckin' shouldn't have." Appellant made a similar remark earlier in the conversation, after Melvin said he "dumped" the gun "in the yard and shit." Appellant responded, "n*****, we just get away, man. I'm on the run now, you shouldn't have fucked up like that and blasted on that n***** man. I told you to give me the heat in the first place." Appellant also made an additional comment suggesting he became intoxicated for the purpose of committing the robbery: "I didn't want to do that shit, man, that's why we got faded out like a mother fucker."

Appellant suggested several times that he and Melvin would not have been caught if Melvin had not lost his apartment

---

[3] Appellant points out in his briefing that the Supreme Court opinion addressing appellant and Melvin's suitability for juvenile court, discussed *infra*, also quoted Melvin as saying, "I wouldn't have shot, man I was like fuck it. I just grabbed for the cash and ran." (See *People v. Superior Court (Jones)*, *supra*, 18 Cal.4th at p. 673.) The transcript of the surreptitious recording admitted into evidence at the evidentiary hearing does not contain that statement. It quotes Melvin as saying, "I know I did, too, then I wouldn't have shot, man. I was like fucked up. I just grabbed the [unintelligible]." The court also attributes to Melvin the statement, "'That's why I got hell fuckin' drunk,'" which is attributed to appellant in the transcript. (*Ibid.*) We note that the recording itself is not in the appellate record and was not admitted at either appellant's trial or the evidentiary hearing.

keys, and said they should "break" or "run" from the police car, "first chance we get." He also stated several times that he and Melvin would get life in prison or "the electric chair." At one point, he added, "I bet we can't get off on a fuckin' first offense, n*****"; he later reiterated, "If you wouldn't have shot him in the face it would have been our first offense." He also stated, "You should have never did this shit on me. If you wouldn't have shot that n***** in the face, we'd be out clean. Cause I would have dumped it on somebody else. But we about to go to jail, n*****. You shot that n***** in the face." He and Melvin both remarked that there would be "[n]o more dank" or "weed" for them while they were in "the penn [*sic*]."

## IV.  Psychiatric Report and Supreme Court Opinion

In July 1996, about two months after the incident, psychiatrist Jack Rothberg, M.D., Ph.D., evaluated appellant at his attorney's request. The purpose of the exam "was to assess his mental state, and determine whether he is amenable to the procedures, treatment and programs available through the Juvenile Court system."

According to Rothberg's report, appellant stated during the exam that Melvin wanted to rob the store for cash. Appellant was reluctant to participate, "but was concerned that Melvin might get hurt, and so he came along, in essence to protect him." Appellant "insist[ed] that he does not use drugs," but admitted that he and Melvin consumed alcohol—wine and vodka—before the incident. Appellant said he had previously seen Melvin with a gun, but also said neither he nor Melvin had experience using a gun; the report noted,"[w]hen loading it they had apparently cocked the trigger, but had no idea how to uncock it."

9

When appellant and Melvin entered the store, it "seemed only a matter of seconds before [appellant] heard 'pow.'" Appellant maintained that Melvin did not intend to shoot anyone, and that the gun "simply discharged while he was pointing it at the store owner." The report continued, "Marcus explains that after that he 'did something stupid' emptying the register and running out." Appellant said he was "'not in my right mind,' apparently because he had some alcohol to drink."

Rothberg noted that appellant "expressed considerable remorse about the crime, both with respect to the victim and the victim's family." He concluded that appellant would be an appropriate candidate for juvenile court.

The Supreme Court ultimately disagreed. It determined that the juvenile court's findings that appellant and Melvin were suitable for treatment under the juvenile court law were not supported by substantial evidence. (See *People v. Superior Court (Jones)*, *supra*, 18 Cal.4th 667.) In its opinion, which was issued before appellant and Melvin were tried, the Supreme Court made two statements that appellant cites as facts in his briefing: (1) the quotation noted above about "grabbing the money" and its attribution to Melvin, and (2) "The minors waited in an alcove near the store for customers to leave." (*Id.* at p. 672.) We note that the Supreme Court also said, (3) "About 6 or 7 p.m., after returning to Melvin's home, the minors continued a discussion they had begun earlier in the day about getting some money for the school prom by robbing someone . . . . According to Melvin, he and his friends frequently talked about 'jacking' someone for money," and (4) "The minors brought masks, apparently obtained from the school lost-and-found, and two gloves." (*Ibid.*) We also

10

note that none of these statements appears elsewhere in the record.

After the Supreme Court issued its opinion, appellant and Melvin were tried together in criminal court. The jury convicted Melvin of first degree murder and robbery, but the court declared a mistrial as to appellant. Appellant was later retried separately. (*People v. Jones* (Sept. 25, 2001, No. B143098) [nonpub. opn.].)

## V. Appellant's Trial Testimony

At his retrial, appellant "relied on an intoxication defense" and testified on his own behalf. (*People v. Jones* (Sept. 25, 2001, No. B143098) [nonpub. opn.].) He testified that he and Melvin were both 15 at the time of the shooting; appellant was one month older than Melvin and therefore was "over-protective" of him. Melvin was like a brother to him; they spent the night at each others' homes, went to the same school and church, and played on the same basketball team.

On May 23, 1996, appellant wore his "green Nike sweats" to school. During homeroom, appellant saw Melvin, who was wearing "blue dark pants." Melvin told appellant he wanted to "do something to get some money," which appellant understood to mean "[r]obbery, stealing something, something illegal." Melvin had made similar comments "in the past," "like a little here, a little there," but appellant "shoved it off" because he had never known Melvin to actually do anything like that before. Appellant did not see Melvin again until lunch time; appellant again ignored Melvin when he raised the issue of trying to get money.

After school, appellant and Melvin went to a friend's house to play video games. They also smoked marijuana and shared a pint of vodka with the friend. On the way home from the friend's house, appellant and Melvin stopped at the liquor store and got

11

someone to buy them another pint of vodka. Appellant and Melvin shared the bottle as they walked toward Melvin's house. On the way, they stopped at a nearby elementary school where they often hung out. Appellant felt very drunk by that point; he vomited twice.

While appellant and Melvin were sitting at the school, Melvin pulled a gun out of his sock and told appellant "he wanted to rob Mr. Lee's store." Melvin said it would be "easy": they would "go in there and get the money and get out." Appellant said he did not want to do it, and that it was wrong. Melvin used "peer pressure words" and taunted appellant, telling him that he was "acting like a punk" and was "fat-ass scared." Appellant testified that he was indeed scared of "the whole situation," because he "didn't want to get killed" and "didn't want to go to jail." Appellant refused to participate, and Melvin eventually said, "Fuck it. I'm going with or without you." When Melvin got up and started walking away, appellant felt "like that was the last time I was gonna see my cousin, my brother, alive again," because he thought Melvin "was gonna get himself killed." Appellant decided to go with Melvin to prevent him from getting hurt and "[k]eep him from hurting anyone."

Appellant tried to talk Melvin out of it the whole way to the store. The pair stopped in an alcove near the store, and Melvin put on a mask and handed appellant a glove. Appellant put the glove in his pocket because he "wasn't going to touch nothing," but he wrapped his basketball bandana around his face because he did not want anyone to think he was "doing what Melvin was thinking about doing." Appellant added that "wasn't the correct thing to do. I was intoxicated. I wasn't thinking rationally." Appellant gave the same explanation for why he did not call his

12

mother, Melvin's parents, or the police to attempt to prevent the crime. Appellant did not try to take the gun away from Melvin because he "didn't know if the gun was loaded" and "wasn't about to risk me accidentally getting shot or him accidentally getting shot. Both of us drunk, tussling with a gun. No. No."

Melvin and appellant left the alcove, and Melvin entered the store. Appellant testified that he did not go into the store. Instead, he stood in the doorway. He thought his presence there would help prevent anyone from getting hurt. Melvin ran to the counter and "bark[ed] a couple words" before appellant heard a gunshot. Appellant then saw Melvin reach over the counter toward the cash register. Appellant said, "What the fuck you doing?" and wondered why Melvin was grabbing money when someone had just been shot. From the doorway, appellant reached for Melvin as Melvin was getting the money and tried to pull him out of the store. Melvin handed money to appellant, who "snatched" it and put it in his pocket before pushing Melvin out the door ahead of him.

Appellant ran with Melvin back toward the elementary school. As they were running, Melvin asked for appellant's bandana; appellant "snatched it off and gave it to him." Appellant did not know what Melvin did with the bandana or his own ski mask. When appellant and Melvin reached the school, they climbed the fence; appellant said he "almost fell down" because he was "still fuzzy a little bit." He and Melvin then ran through the schoolyard and climbed over another fence. They then walked to Melvin's apartment.

Appellant and Melvin climbed the stairs to the apartment. "Not very long" after that, police arrived, pulled them down the stairs, and detained them. In the police car, appellant

13

"express[ed] [his] true feelings" to Melvin, "that I felt like he fucked up our life personally." Appellant said he felt "helpless" at the time, because he had seen someone get shot and "couldn't stop it."

On cross-examination, appellant admitted that he lied to Rothberg about using drugs, though on redirect he said that he thought Rothberg had been referring to hard drugs, not marijuana. He said he did not recall telling Rothberg that he had previously seen Melvin with a gun. Appellant also said that he told Rothberg that Melvin had cocked the trigger, because "both of us can't cock the trigger." Appellant denied telling Rothberg, "I did something stupid" by emptying the register. On redirect, he explained that he told Rothberg that Melvin did something stupid by emptying the register.

Appellant stated that he watched Melvin load the gun while they were sitting at the elementary school, contradicting his earlier testimony that he did not know if the gun was loaded. When pressed by the prosecutor about his understanding of the plan and awareness that Melvin was loading the gun, appellant explained that he was drunk but not "pissy drunk." He further agreed that he "knew at that time that in the course of robbing that store, somebody could get killed."

Appellant said he "wasn't scared of" Melvin and "[d]idn't feel pressure" from Melvin's taunts and use of what he called "the usual peer pressure." He took Melvin seriously when Melvin said he would do it with or without appellant, however, and agreed with the prosecutor's characterization that he thought Melvin "had a death wish" when Melvin started walking away from him. Appellant nevertheless "lazily dragged up and I followed him." He reiterated that he tried to talk Melvin out of the plan, and

that he put the bandana on because he "didn't want nobody seeing me, thinking I was part of what Melvin was doing." Appellant denied ever touching the gun or even "paying attention" to it during the robbery. Because he had "less maturity" at the time, he never tried to take the gun away from Melvin or yell that he was armed; he thought his mere "presence" in the doorway would help the situation. After the shooting, appellant did not shout for help or check on Lee; he did not "want to see if Mr. Lee was alive" because he had "never seen a dead body before, and I didn't want to see one."

## PROCEDURAL HISTORY

### I.     Conviction and Direct Appeal

On February 11, 1999, the People filed an information charging appellant and Melvin with the murder (§ 187, subd. (a)) and robbery (§ 211) of Lee.[4]  The information also alleged as to both counts that a principal was armed with a handgun (§ 12022, subd. (a)(1)).  A robbery-murder special circumstance (§ 190.2, subd. (a)(17)) was alleged but appears to have been stricken.

On May 22, 2000, a jury found appellant guilty of first degree murder and second degree robbery and found the firearm allegations true.  On July 13, 2000, the court sentenced him to 25 years to life for the murder conviction, plus one year consecutive for the related firearm enhancement.  The court stayed sentence on the robbery conviction under section 654.  A different panel of this court affirmed appellant's convictions and sentence on direct

---

[4]     The People filed the information in superior court after the Supreme Court determined the juvenile court's findings that appellant and Melvin suitable for treatment under the juvenile court law were not supported by substantial evidence.  (See *People v. Superior Court (Jones)*, *supra* 18 Cal.4th 667.)

15

appeal. (See *People v. Jones* (Sept. 25, 2001, No. B143098) [nonpub. opn.].) The factual summary portion of the opinion, summarized appellant's testimony, including his assertions that he tried to dissuade Melvin, participated reluctantly in an effort to prevent anyone from getting hurt, and did not shoot Lee.

## II.   Section 1172.6 Proceedings

### A.   Petition

On May 15, 2019, appellant, through counsel, filed a petition for resentencing pursuant to section 1172.6. In his petition, appellant made the representations required by section 1172.6, subdivisions (a) and (b). Appellant also characterized the factual summary of his testimony in the direct appeal opinion as specific findings "that Mr. Jones did not personally kill the victim, that the victim was shot by Mr. Jones's co-defendant, and that Mr. Jones did not want to participate in the underlying robbery, tried to dissuade his co-defendant, and only accompanied his co-defendant because he hoped his presence would prevent anyone from getting hurt." "Based on the aforementioned," appellant asserted that he was entitled to resentencing.

### B.   Initial Briefing and Hearing

The People filed a response[5] arguing that appellant was ineligible for resentencing because he was a major participant in

---

[5]   The People's response and attachments thereto are not included in the record on appeal, nor are the materials appellant originally filed in reply. On our own motion, we take judicial notice of the appellate record in appellant's previous section 1172.6 appeal, *People v. Jones*, No. B304692, which contains those documents. (See Evid. Code, §§ 452, subd. (d), 459.) We note that the record on appeal does include the reply brief and attachments appellant filed after we remanded the matter.

the crime under *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and acted with reckless indifference toward human life under *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). The People attached our opinion from appellant's direct appeal, as well as some transcripts from appellant's trial. Appellant filed a reply, to which he attached several documents. He argued that he was entitled to resentencing because "[t]he People failed to prove *beyond a reasonable doubt* that Mr. Jones was *both* a major participant *and* acted with reckless indifference to human life." Appellant further contended that he was not a major participant and did not act with reckless indifference to human life under *Banks* and *Clark*.

After a hearing, the court found that appellant was a major participant in the crime and acted with reckless indifference toward Lee's life and accordingly denied the motion. Appellant timely appealed.

### C.     Previous Appeal

On appeal, appellant contended the court erred by making factual findings at the prima facie stage of the case. A different panel of this court agreed and reversed the trial court's order denying the petition. The opinion remanded the matter with directions to issue an order to show cause and proceed consistently with section 1172.6, subdivision (d). (See *People v. Jones* (Apr. 22, 2021, No. B304692) [nonpub. opn.].)

### D.     Evidentiary Hearing and Ruling

On remand, appellant filed a second reply brief. He again argued that he was not a major participant in the crime and did not act with reckless indifference to human life. He also asserted that his age at the time of the crime decreased his culpability. Appellant provided a statement of facts based on the eight

17

exhibits that were attached to his brief and ultimately were admitted at the evidentiary hearing. It does not appear that the People made any additional filings.

At the evidentiary hearing, the parties stipulated to the admission of all the exhibits attached to appellant's second reply brief, which are listed above in the Factual Background.[6] The matter then proceeded to argument.

The People began by incorporating the arguments in their "original moving papers," which we understand to mean their response to the petition. They contended that appellant was a major participant who acted with reckless indifference to human life, emphasizing evidence suggesting he took money from the store after Melvin shot Lee in the face and his post-arrest statements that Melvin should not have had the gun in the first place. The People further asserted that various portions of appellant's trial testimony were not credible, including his assertion that he never entered the store during the crime. They acknowledged that at least one of the *Clark* factors favored appellant, but urged the court to find that he was a major participant who acted with reckless indifference to human life.

Appellant contended the People failed to carry their burden of proving beyond a reasonable doubt that he was a major participant who acted with reckless indifference to human life. He emphasized that he was only 15 at the time and was not the actual killer. Despite repeatedly asserting that "the basic facts of

---

[6] Three of those exhibits, Ochoa's trial testimony, appellant's trial testimony, and the transcript of the surreptitious recording, were also offered by the People. The parties also stipulated that Ochoa was legally unavailable to testify at the evidentiary hearing.

this case are generally agreed upon by both parties," appellant maintained that he never entered the store and that Melvin took the money. Appellant argued that all the *Banks* factors indicated he was not a major participant; he asserted that his involvement in the planning and execution of the crime was minimal, and that he intended only to "persuade Melvin out of it" and "keep Melvin from getting killed or hurting anyone." Appellant also argued that all the *Clark* factors indicated that he did not act with reckless indifference to human life. Appellant acknowledged that fleeing the scene without aiding Lee was "not the most admirable course of action he could have taken," but asserted that it did not "tip the scales in favor of him being convicted on murder on this case, and it's not probative of reckless disregard." He also reiterated that neither he nor Melvin had a history of violence, he "thought that his presence during the robbery would minimize" the risk of violence, and the shooting happened moments after Melvin entered the store.

In rebuttal, the People argued that the "youth factor" did not prevent appellant from "reaching over and taking the money," or making statements and engaging in conduct indicating that he "clearly understood the consequences of his actions." In surrebuttal, appellant argued that his knowledge that Melvin had a loaded gun was insufficient to establish reckless indifference. He also reiterated that he was in the doorway of the store, but asserted that even if he was inside the store, he did not have an opportunity to prevent the shooting because it happened quickly. Finally, appellant asserted that his age at the time limited his ability to appreciate the consequences of his actions.

The court began its oral ruling by noting that it was "very important to consider . . . the defendant's age at the time of this

19

incident." It found, however, that the transcript of the post-arrest conversation evinced appellant's "sophistication," "fears . . . for himself," and awareness that Melvin "shot the person in the face." The court also noted that appellant "lament[ed] the fact that he didn't have the gun instead of his younger cousin." The court said "[t]hose facts are very important to the court for two reasons: one, they come directly from the defendant himself, the petitioner himself. This is what the petitioner has in his mind immediately after this heinous act; two, it shows that he is not an unsophisticated typical 15 year old. He's talking about the money, . . . he talks about being in the pen for some while. He's very aware of the nature of what happened."

After incorporating by reference "in my findings here all of the factors" the People outlined,[7] the court found that appellant and Melvin planned the incident over a full day, that appellant was present when the gun was being loaded, and that appellant knew that an armed robbery "presents a whole other level of dangerousness to a typical robbery." The court further found that appellant "was immediately interested in the money," that he and Melvin took steps to conceal their identities before the robbery, and that they ran away together afterward rather than rendering aid to Lee.

The court ultimately concluded: "I think from all of the factors it's pretty clear that the People have proven beyond a reasonable doubt that the defendant was a major participant, not only in the planning and the execution of this crime, but in the

---

[7] The court did not clarify whether it intended to incorporate the People's oral argument, written argument, or both. The People asserted in both arguments that appellant entered the store and took the money.

20

getting away safely afterwards of the crime, and he acted with absolutely reckless disregard for the life of Mr. Lee. Both before when he planned the crime he had no fear about the fact that they were going in with an armed gun, a loaded gun, and afterwards he showed that he was absolutely indifferent to whether or not Mr. Lee lived or died. His only concern at that point was getting away, splitting the money, avoiding a life sentence. So for that reason the motion is denied. The court does find beyond a reasonable doubt that the People have met their burden in proving that the defendant did act with reckless disregard, that he was a major participant, and he could still today be convicted of murder."

Appellant timely appealed.

## DISCUSSION

### I.    Section 1172.6

The Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437) "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); accord, § 189, subd. (e); *People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).) As amended by SB 1437, section 189 now limits liability under a felony-murder theory to "actual killer[s]" (§ 189, subd. (e)(1)) and those who, "with the intent to kill," aid or abet "the actual killer in the commission of murder in the first degree" (*id.*, subd. (e)(2)). Individuals who do not fall into those categories can be held liable for murder only if they were "major participant[s] in the underlying felony and acted

21

with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2" —the statute defining the felony-murder special circumstance. (*Id.*, § 189, subd. (e)(3); see *People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).*)*

SB 1437 also added section 1172.6 to the Penal Code, permitting individuals who were convicted of felony murder or murder under a natural and probable consequences theory, but who could not be convicted of murder following SB 1437's changes to sections 188 and 189, to petition the sentencing court to vacate the conviction and resentence on any remaining counts. (§ 1172.6, subd. (a).) When a petitioner files a "complying petition," the court must appoint counsel if requested, "the issue is briefed[,] and then the court makes one (not two) prima facie determination." (*Lewis*, *supra*, 11 Cal.5th at p. 966.) In the limited prima facie inquiry, the court issues an order to show cause if the petitioner's factual allegations, if true, would demonstrate an entitlement to relief. (See *id.* at p. 971.)

Once an order to show cause issues, the matter proceeds to an evidentiary hearing at which the People have the burden of proving beyond a reasonable doubt "that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) At the hearing, the court "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (*Ibid.*) Additionally, both the petitioner and the People "may also offer new or additional

evidence to meet their respective burdens." (*Ibid.*) "A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*) Resentencing is unavailable if the petitioner was a major participant in the underlying felony and acted with reckless indifference to human life. (*Strong, supra*, 13 Cal.5th at p. 710.) The trial court acts as an independent factfinder and determines whether the prosecution has met its burden. (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984 (*Ramirez*).)

## II.  Standard of Review

The trial court concluded that appellant was a major participant who acted with reckless indifference to human life. Appellant contends the record does not support this conclusion. On appeal from an order denying a section 1172.6 petition after an evidentiary hearing, we review the trial court's factual findings for substantial evidence. (*People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090; *People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).) "We '"examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt."'" (*Clements, supra*, 75 Cal.App.5th at p. 298, quoting *People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.) "Our job on review is different from the trial judge's job in deciding the

23

petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements*, *surpa*, at p. 298.)

As particularly relevant here, we do not reweigh evidence or revisit credibility determinations made by the trial court. (See *People v. Cody* (2023) 92 Cal.App.5th 87, ___. Thus, appellant's repeated contentions that he did not enter the store and that "[t]he bulk of the evidence actually supports that Melvin took the money" are not well-taken. We are not concerned with the "bulk" of the evidence; so long as substantial evidence supports the trial court's implicit or explicit findings, we are obligated to accept those findings.

Reversal on insufficiency of the evidence is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the ruling]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 639.)

## III.  The *Banks* and *Clark* Factors

In *Banks*, *supra*, 61 Cal.4th 788, and *Clark*, *supra*, 63 Cal.4th 522, the California Supreme Court set forth the factors relevant to determining whether a defendant is a major participant in a felony who acted with reckless indifference to

life.  The major participant and reckless indifference factors "significantly overlap" in that "'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark*, *supra*, 63 Cal.4th at pp. 614-615, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 153 (*Tison*).)

In *Banks*, *supra*, 61 Cal.4th 788, the Supreme Court set out a nonexhaustive list of considerations relevant to whether a defendant's participation in criminal activities known to carry a grave risk of death is sufficiently significant to render him or her a "major participant" in the crime.  (See *Strong*, *supra*, 13 Cal.5th at p. 705, citing *Banks*, *supra*, 61 Cal.4th at pp. 705-706.)  Those considerations are:  "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.)

*Clark*, *supra*, 63 Cal.4th at pp. 618-623, similarly set forth a list of considerations relevant to determining whether a defendant acted with reckless indifference to human life.  The first factor relates to weapons: was the defendant aware that weapons would be used in the felony?  Did the defendant use a weapon?  How many weapons were used in the crime?  (*Clark*, *supra*, 63 Cal.4th at p. 618.)  The court cautioned that "[t]he mere

fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Ibid.*; see also *id.* at p. 617, fn. 74 ["A robbery in which the only factor supporting reckless indifference to human life is the fact of the use of a gun is what we meant by 'a garden-variety armed robbery' in *Banks*, *supra*, 61 Cal.4th at p. 802."].) The second factor is the defendant's physical proximity to the murder and the events leading up to it, and the opportunities that proximity afforded to restrain the crime or aid the victim. (*Clark*, *supra,* 63 Cal.4th at p. 619.) The third factor is the duration of the felony, particularly the duration of the interaction between victims and perpetrators; more prolonged incidents provide "'a greater window of opportunity for violence.'" (*Id.* at pp. 620-621.) The fourth factor is the defendant's awareness of his or her codefendants' propensity for violence or likelihood of killing a victim. (*Id.* at p. 621.) The final factor is the defendant's efforts to minimize the risk of violence during the felony, though the court cautioned that "some effort to minimize the risk of violence does not, in itself, necessarily foreclose a finding that defendant acted with reckless indifference to human life." (*Id.* at pp. 621-622.) The court further cautioned that although recklessness has a subjective element, "it is the jury's objective determination that ultimately determines recklessness"; "a defendant's good faith but unreasonable belief that he or she was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference to human life." (*Id.* at p. 622.) At bottom, reckless indifference "encompasses a willingness to kill (or assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his [or her] actions." (*Id.* at p. 617.)

26

No single *Banks* or *Clark* factor is determinative. (*Clark*, *supra*, 63 Cal.4th at pp. 618, 621–623.) Instead, courts must assess the totality of a defendant's culpability along a spectrum spanning from *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*), in which defendant, a classic getaway driver for an armed robbery, was minimally culpable for the murder that ensued, to *Tison, supra*, 481 U.S. 137, in which the very culpable defendants helped convicted murderers escape from prison, provided weapons, and stood by as their confederates debated killing, then killed, an innocent family. (See *Banks*, *supra*, 61 Cal.4th at pp. 794, 801–803; *Clark*, *supra*, 63 Cal.4th at pp. 609, 612-614, 618; *Strong*, *supra*, 13 Cal.5th at p. 705 [discussing the *Enmund-Tison* spectrum of culpability].)

A defendant's youth at the time of the crime is a circumstance that may be relevant to his or her placement on the culpability spectrum. (See *In re Moore* (2021) 68 Cal.App.5th 434, 453-454 (*Moore*); *Ramirez*, *supra*, 71 Cal.App.5th at p. 987.) This is because children generally lack the experience, perspective, and judgment of adults, and are also generally less responsible and mature. (*Moore*, *supra*, 68 Cal.App.5th at p. 453.) Further, children tend to act more immaturely or impetuously than adults and may fail to appreciate the risks and consequences of their actions. (*Id.* at p. 454.) Like all the other factors, youth alone is not dispositive. (*In re Harper* (2022) 76 Cal.App.5th 450, 470.)

## IV.    Analysis

Before proceeding to our analysis of the *Banks* and *Clark* factors, we note that appellant complains that the trial court "did not discuss any factors or any case law before denying appellant's petition nor did the court distinguish between major participant

27

and reckless indifference to human life" and instead "focused on how appellant and Melvin spoke to each other in the police car after their arrest."[8] Appellant contends this constituted an impermissible imposition of the court's own views "without any reference to or application of relevant case law." He further asserts that the court "did not reveal what parts of the evidence it had considered beyond the secret recording from the police car," and, even with regard to that piece of evidence, "did not fully examine what appellant and Melvin actually revealed in their conversation." However, on appeal we review the correctness of the lower court's decision, not its rationale. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976; *People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12; see also *US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 909 ["We do not review the rationale for the court's decision. Rather, if there is substantial evidence to support the result under the correct standard, we will affirm."].)

---

[8] Appellant also asserts the court "acknowledged that it had not read all of the exhibits that constituted the evidence at the hearing before denying appellant's petition." The court actually said, "I appreciate the exhibits, I've gone through most of them before today's hearing. I'm going through, again, the transcript of the recording of your client's statements after, immediately following the shooting, and I've refreshed my memory about the facts inside of that transcript." Reading this language in the light most favorable to the ruling suggests the court had refreshed its recollection of some of the exhibits immediately before the hearing. There is no evidence in the record suggesting the court failed to review all the exhibits, which were provided with multiple filings. "In the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence." (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1092.)

Moreover, the major participant and reckless indifference factors "significantly overlap" (*Clark*, *supra*, 63 Cal.4th at p. 615); separate discussion of those factors may not be necessary in every case, though we discuss them separately here for clarity.

### A. Major Participant (*Banks*)

We apply the *Banks* factors and consider the totality of the circumstances. We conclude substantial evidence supports a finding that appellant was a major participant in the robbery.

With regard to the first factor, appellant's role in planning, appellant asserts that the only evidence "came from appellant's statements" that Melvin was the mastermind and appellant's only role was, essentially, trying to talk Melvin out of it. "Thus, this factor does not support that appellant had a role in planning the robbery." We disagree. Appellant's testimony, originally offered in support of his defense at trial, indeed minimizes his planning role. Other evidence in the record suggests he was more actively involved, however. The Supreme Court opinion—on which we again note that appellant relies to support factual assertions—indicates that appellant and Melvin frequently talked about "jacking" someone for money, engaged in an ongoing "discussion" about the robbery throughout the day, and took the preparatory step of acquiring facial coverings from the lost-and-found at their school. Even setting aside those statements, the psychiatric report suggests appellant and Melvin jointly loaded and cocked the gun. More telling are appellant's surreptitiously recorded statements, which indicate that he "got hell fuckin' drunk" and "faded out like a mother fucker" to build himself up for the robbery hours before his testimony indicated that he knew of the full plan. Appellant also stated twice that he knew Melvin should have given him the gun, from which it can reasonably be

29

inferred that he was more extensively involved in planning the logistics of the robbery than his self-serving testimony indicated.

As to the second factor, his role in supplying or using lethal weapons, appellant contends he was uninvolved in either aspect. We agree the evidence indicates that Melvin procured the gun and fired at Lee. As noted above, however, the psychiatric report indicates that appellant was involved in loading and cocking (and then unsuccessfully attempting to uncock) the gun. Additionally, eyewitness Ochoa said he saw the person in green pants remove a gun from his waistband before the two males entered the store. Another eyewitness said the person in green pants was carrying the gun as the two males ran from the store. This substantial evidence suggests appellant had some involvement with the lethal weapon.

The third factor is appellant's awareness of particular dangers posed by the crime, weapons used, or past experience or conduct of other participants. Appellant acknowledges that he "knew that an armed robbery was illegal and dangerous," but asserts that neither he nor Melvin had prior experience with crimes, violence, or guns, and appellant "had no reason to even suspect that Melvin might actually fire the gun." Respondent Attorney General points out that the psychiatric report states that appellant previously had seen Melvin with a gun. Respondent also suggests, and we agree, that appellant's post-arrest comments that he should have been the one to hold the gun evince an awareness that Melvin posed a danger with the weapon.[9] Respondent's suggestion that Melvin's possible status

_____

[9]    Appellant maintains that the People and respondent "have taken appellant's comment out of context," because he "said this

30

as a gang member rendered him more dangerous is less well-taken; gang membership alone does not demonstrate a propensity to commit lethal violence. (See *Banks*, *supra*, 61 Cal.4th at pp. 810-811; *In re Ramirez* (2019) 32 Cal.App.5th 384, 405.) More relevant in our view is appellant's testimony that he did not try to take the gun from Melvin because he did not want to "risk me accidentally getting shot or him accidentally getting shot. Both of us drunk, tussling with a gun." It is reasonable to conclude from all this evidence that appellant recognized that the robbery posed a particular danger.

The fourth factor considers whether appellant was present at the scene and in a position to facilitate or prevent the murder, and whether his actions or inaction played a particular role in the death. Appellant concedes he was at the scene, but asserts the shooting happened so quickly that he had no realistic opportunity to prevent it. He also emphasizes Melvin's post-arrest comments suggesting the shooting was unintended. Respondent argues that appellant was "actively involved in the execution of the robbery, including the wearing of masks," but it is unclear what relevance appellant's attire had to his presence or ability to prevent Melvin from shooting. What is clear is that appellant was not only present but very close to Melvin throughout the incident. Ochoa testified that he (Ochoa) was only four or five

right after asking Melvin what he did with the gun," such that the "implication is that appellant was referring to the time during which they were fleeing." Even if we were to accept this inference, which the standard of review precludes here, we note that appellant omits any mention of the other time he said "I know you shouldn't have fuckin' held the gun, man. I know you fuckin' shouldn't have," which is nowhere proximate to any statements about fleeing.

feet away from the shooter, despite being outside the store, which means appellant necessarily was close enough to exercise a restraining effect. (See *In re Ramirez, supra*, 32 Cal.App.5th at p. 405 [suggesting that proximity of "feet away" may be "close enough to exercise a restraining effect on the crime"].) Appellant also had ample opportunity to scuttle the plan or take the gun prior to arriving at the store. On the other hand, as discussed more fully below, courts have recognized that defendants may have limited opportunity to intervene at the scene when a shooting occurs quickly. In short, this factor is somewhat mixed.

The final factor is what appellant did after lethal force was used. Appellant contends that he simply fled the scene with Melvin; he disputes the People's assertion that he disposed of evidence. Elsewhere in his briefing, indeed throughout it, he also maintains that the "bulk of the evidence" shows that Melvin was the one who took the money after Lee was shot. As discussed above, we do not weigh the evidence on appeal. Instead, we consider whether substantial evidence supports the court's adopted finding that appellant took the money after Lee was shot. We conclude it does. Appellant's self-serving trial testimony indicated that Melvin took the money, but the money was found in appellant's pocket, not Melvin's, when they were arrested. The psychiatric report also noted that appellant said he "'did something stupid' emptying the register and running out," and appellant remarked during the post-arrest conversation that after the shooting, "We can't do shit but grab money, man . . . ." A reasonable factfinder certainly could conclude from this evidence that appellant took the money after Lee was shot, rather than rendering aid or even simply fleeing. We thus agree with respondent that "[t]his factor does not help appellant."

In sum, the record contains substantial evidence to support the conclusion that appellant was a major participant in the robbery.

### B. Reckless Indifference (*Clark*)

As we observed above, there is significant overlap between being a major participant and having a reckless indifference to human life, and "'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" *Clark*, *supra*, 63 Cal.4th at pp. 614-615.) Applying the *Clark* factors and considering the totality of the circumstances, we conclude the record contains sufficient evidence from which the trial court could conclude beyond a reasonable doubt that appellant acted with reckless indifference to the life of Lee.

The first *Clark* factor overlaps with the second *Banks* factor: what did the defendant know about the weapons used in the felony? Did the defendant use a weapon? How many weapons were used in the crime? (*Clark, supra*, 63 Cal.4th at p. 618.) We agree with appellant that mere knowledge a weapon would be used is not sufficient to establish reckless indifference. (See *Clark*, *supra*, 63 Cal.4th at p. 618.) The evidence suggests, however, that appellant had more than "mere knowledge" that a weapon was present. At a minimum, he knew the weapon was not only loaded with multiple rounds but also cocked, and two witnesses testified they saw him with the weapon before and/or after the robbery. (Contra *People v. Keel* (2022) 84 Cal.App.5th 546, 559 (*Keel*) [no evidence that defendant knew codefendant's gun was loaded].) Appellant's assertion that he "did not have any reason to believe Melvin would fire the gun" is also not persuasive on this record. As discussed above, appellant stated

multiple times that he should have been the one to wield the gun, suggesting an awareness that the weapon posed more risk in Melvin's hands.  Appellant also recognized that the risk of an accidental shooting was heightened because both he and Melvin were intoxicated; that recognition prevented him from disarming Melvin so as to protect himself, but not from moving forward with the robbery and placing others at risk.

The second *Clark* factor, the defendant's physical proximity to the murder and the events leading up to it, and the opportunities that proximity afforded to restrain the crime or aid the victim, is similar to the fourth *Banks* factor.  As already discussed, appellant was with Melvin for several hours prior to the robbery, present throughout the robbery and murder, and fled with Melvin afterward.  Despite his contentions that he did not enter the store or take money from the register, substantial evidence—Ochoa's testimony and the money in his pockets at the time of his arrest—supports the opposite conclusion.  Appellant also had ample opportunity prior to the robbery to alert someone or undertake more active efforts to stop the crime.

Appellant nevertheless argues that this factor weighs against a finding of reckless indifference because the shooting happened quickly and unexpectedly.  (See, e.g., *In re Scoggins* (2020) 9 Cal.5th 667, 679 (*Scoggins*) ["although Scoggins was in close contact with his accomplices before the shooting, he lacked control over their actions once they arrived on the crime scene, especially given how quickly the shooting occurred"]; *Moore, supra*, 68 Cal.App.5th at p. 452 [the "short duration of the robbery and the sudden and unprovoked nature of the shooting reinforce" the conclusion that a defendant present in a car near the robbery did not act with reckless indifference]; *Ramirez,*

34

*supra*, 71 Cal.App.5th at p. 989 ["[t]he attempted carjacking was executed quickly, providing Ramirez no realistic opportunity to intervene before Rios opened fire"].) While the cases appellant cites support the proposition that a defendant may not have an opportunity to intervene if a shooting happens quickly, they are distinguishable in that the defendants were far less proximate to the shooting. In *Scoggins*, the defendant "was not physically present at the crime scene," and it was "not clear whether Scoggins could even see the confrontation between his accomplices and [the victim] from his position." (*Scoggins*, *supra*, 9 Cal.5th at p. 678.) In *Moore*, the defendant "likely saw Russell rob and shoot [the victim] while he sat in the stolen Mazda," but "he never left the car" and thus was "not 'close enough to exercise a restraining effect on the crime.'" (*Moore*, *supra*, 68 Cal.App.5th at p. 452.) In *Ramirez*, the defendant was at the scene but on the opposite side of the car from the codefendant who began shooting. (*Ramirez*, *supra*, 71 Cal.App.5th at p. 989.) Here, appellant was not only at the scene but was mere feet from Melvin the entire time. He was thus sufficiently proximate to "exercise a restraining effect on the crime," yet according to his own testimony instead chose to not pay attention. This factor accordingly is more mixed than in the cases appellant cites, notwithstanding the short duration of the crime.

The duration of the crime is, incidentally, the third *Clark* factor. "[C]rimes of longer duration present greater risk of violence and therefore evince more reckless indifference." (*People v. Saibu* (2022) 81 Cal.App.5th 709, 740.) Here, there is no real dispute that the robbery was brief; even respondent concedes this factor "was at best neutral as the shot was fired not long after the

two entered the store." We agree with appellant that the short duration of the crime suggests a lack of reckless indifference.

The fourth factor is whether the defendant is aware of his or her codefendants' propensity for violence or likelihood of killing a victim. (*Clark*, *supra*, 63 Cal.4th. at p. 621.) This factor overlaps the third *Banks* factor, and we incorporate our previous discussion of the substantial evidence from which a reasonable factfinder could conclude that appellant knew the robbery posed a particular danger. Appellant contends that "[m]ore telling was the shock and surprise appellant expressed at the shooting during his conversation with Melvin in the police car after their arrest," which "shows that appellant did not harbor a reckless indifference to human life." We are disinclined to ascribe particular emotions to the cold record of the transcript or give such emotions controlling weight in our analysis; "the cold record seldom captures indications like facial expressions, tones of voice, or hesitancy." (*People v. Poore* (2022) 13 Cal.5th 266, 297.) Appellant's words speak for themselves, and they support the inference that appellant recognized it was dangerous for Melvin to handle the gun and proceeded with the crime regardless.

The final *Clark* factor is the defendant's efforts to minimize the risk of violence during the felony. In *Clark*, such efforts included planning to use an unloaded gun and scheduling the robbery when the store was closed to minimize risks to employees. (See *Clark*, *supra*, 63 Cal.4th at pp. 621-622.) Appellant contends his efforts to minimize violence included trying to talk Melvin out of committing the robbery and taking no action "that increased the risk of violence beyond the risk inherent in Melvin carrying a loaded gun into the store to obtain money." He also points to the Supreme Court's statement that he

and Melvin "waited near the store for customers to leave" before entering, reiterates his contention that Melvin stole the money, and asserts that his immediate flight from the scene did nothing to heighten the danger to Lee. Even crediting appellant's testimony about his efforts to persuade Melvin not to go through with the robbery and the Supreme Court's statement that he and Melvin actively waited for customers to leave, sufficient evidence supports a finding that appellant did not take steps to minimize the risk of violence. He and Melvin committed the robbery when the store was open and employees and numerous bystanders were present. Indeed, their plan expressly accounted for the presence of bystanders. Rather than insisting that no gun be used or that the gun be unloaded, appellant helped Melvin load and cock the gun. Appellant also got "hell fuckin' drunk" and "faded" before accompanying Melvin, who he said should not have been the one to carry the weapon and was fearful of disarming.

Appellant contends there was no evidence that Lee could have survived if he had stayed at the scene, and that he "could have believed that help would arrive," given the numerous other people near the store. However, the police report indicates that Lee was not pronounced dead until he arrived at the hospital, from which it can be inferred that he remained alive at the scene. Appellant's speculation about his own possible beliefs is not persuasive, particularly given the extensive amount of his testimony in the record. Neither is his reliance on *In re Taylor* (2019) 34 Cal.App.5th 543, 559, in which "there was no evidence that Taylor appreciated how badly [the victim] was wounded" and apparently "knew help was arriving." Here, appellant's post-arrest statements indicate he was well aware that Lee had been shot in the face and was grievously wounded, and he testified at

37

trial that he did not "want to see if Mr. Lee was alive" because he feared Lee would not be.

At trial, appellant cited his lack of "maturity" as a reason he believed he could prevent injury by accompanying Melvin during the robbery. In his appellate briefing, he characterizes himself as "a scared and angry 15-year-old who, having joined his 15-year old cousin in a planned robbery after failing to talk him out of it, saw his cousin inexplicably shoot the store owner in the head seconds after entering the store." He contends his "youth significantly undercuts any argument that appellant acted with reckless indifference to human life." He finds support for this contention in *Moore*, *supra*, 68 Cal.App.5th 434, *Keel*, *supra*, 84 Cal.App.5th 546, and *Ramirez*, *supra*, 71 Cal.App.5th 970.

As we acknowledged above, appellant's age at the time of the offense is relevant to whether he acted with reckless indifference. Case law in this area recognizes that youth are relatively more impulsive than adults and may be vulnerable to peer pressure. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489.) The trial court expressly considered appellant's age and concluded that the totality of the circumstances, including appellant's post-arrest statements, demonstrated an appreciation of the risks akin to that of an adult. Although the evidence could perhaps be viewed differently, substantial evidence supports the trial court's conclusion.

Appellant testified that he did not succumb to peer pressure from his younger cousin Melvin. Substantial evidence also showed he was aware of the risks posed by the loaded, cocked gun in the hands of his intoxicated cousin: he testified that he feared being accidentally shot before the robbery even commenced. He also testified that he was aware of the risk that

he or Melvin might die during the robbery, or face substantial consequences if they were caught. Immediately after the incident, appellant stated that he "got faded out like a mother fucker" for the purpose of engaging in the crime, "thought Melvin was gonna get himself killed," knew Melvin "shouldn't have fuckin' held the gun," and recognized they could not "do shit but grab money" and faced life in prison after Lee was shot. Evidence of this type of self- and situational awareness shows that appellant acted with a mental state "encompass[ing] a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark, supra*, 63 Cal.4th at p. 617.) Analogous evidence is notably absent from the cases appellant cites.

## DISPOSITION

The order of the trial court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


CURREY, P.J.


ZUKIN, J.